[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action by the plaintiffs Layne Miller and Paula Miller against the defendants Peter Guimaraes and Guimaraes Construction, Inc. alleging fraudulent misrepresentation (count one); violations of the Connecticut Unfair Trade Practice Act, Conn. Gen. Stat. § 42-110g
(count two); common law conversion (count three); breach of contract (count four); and breach of implied duty of good faith and fair dealing (count five), involving a contract for the construction of a new home in the town of Rocky Hill. The defendants filed an answer together with a claim of set off and counterclaim against the plaintiffs, alleging breach of contract (count one); and breach of their duty of good faith and fair dealing (second count).
The facts are as follows. During the second week of February, 1999, the plaintiffs Layne and Paula Miller were driving by a subdivision where construction was going on. They saw an empty lot, lot #31 on Bolder Drive. The sign had the name Guimaraes Construction, Inc. on it. The plaintiffs walked over to where men were working in the subdivision and inquired who they could talk to about the lot. They were given the name of Peter Guimaraes. Peter Guimaraes was called and met the Millers at the lot that same day. Peter Guimaraes told the Millers that he had reserved the lot for himself but that since business had picked up he felt it was not a good time for him to build for himself, that he was looking in Avon for himself. The Millers were told that they would have to give a deposit on the lot in order to hold it for them. They were told another party had expressed an interest in the lot. The Millers gave a check for $1,000 as a deposit on the lot. The check was dated February 16, 1999.
The Millers together with Mrs. Millerts mother, Mrs. Volpe, met with CT Page 5193 Peter Guimaraes on March 6, 1999, to look at houses in the subdivision which he had built. Mrs. Volpe was told by Peter Guimaraes that he had held on to the lot for himself but that business was good so he had decided to sell the land. The Millers gave two additional deposits of $20,000 each. By April 2, 1999, the Millers had given $41,000 in deposits made out to Guimaraes Construction, Inc. The Millers signed a construction contract with Peter Guimaraes and Guimaraes Construction, Inc. on April 2, 1999. This is the only signed agreement between the parties.
The Millers went to the American Savings Bank for the mortgage money the first week of April, 1999. The following week the Millers gave the Bank their financial records. At this second meeting the bank told the Millers they were approved for the loan and that the bank needed drawings of the home. When the Millers subsequently asked Peter Guimaraes for the drawings they were told they were not ready. Instead Peter Guimaraes gave the Millers drawings of another home which was similar to the one he was going to build for the Millers and told the Millers that these would be good enough for the bank. The Millers took these drawings to the bank and told the bank that these were not drawings of the house to be built for them but that they were similar to it.
By mid-April the bank had everything it needed for approval of the Miller loan and the Millers had been so informed informally. By letter dated May 25, 1999, the bank formally approved the loan. Earlier when the Millers received their verbal commitment form the bank, they advised Peter Guimaraes and he told them he already knew.
In mid April the Millers asked Peter Guimaraes regarding the building permit. He told the Millers that he had applied for a building permit. Upon subsequent inquiry by the Millers at the town hall they learned that a building permit had not been applied for or issued. The Millers confronted Peter Guimaraes with this information and also reminded him that they did not have drawings of the house to be built for them. Peter Guimaraes became very angry over the phone, which prompted the Millers to ask for a return of their $41,000. He told the Millers they were not getting their money back, that by the time the matter went through the courts they would have expended more than their $41,000. After this heated conversation the Millers consulted an attorney and decided to go forward with the house because it was clear that Peter Guimaraes was not going to return their money. A closing date was scheduled for June 7, 1999. The Millers requested certain conditions be met before the closing date. These were that Peter Guimaraes have the building permit and that he have the drawings of the house. The Millers were concerned about the fact that Guimaraes did not have the building permit and that they definitely had to see what the house was going to look like. CT Page 5194
Guimaraes promised the blue prints for the closing on June 7, 1999. In mid-April of 1999 Peter Guimaraes told the Millers for the first time that there were wetlands on their property and that in order to get a building permit he had to get a wetland permit as well. The Millers had not been told there were wetlands on the lot and that the Wetland Commission had to issue its permit before a building permit could be secured. Under the written agreement entered into between the Millers and Guimaraes Construction, Inc. all necessary permits were to be obtained by April 30, 1999. This did not happen. Nor did it happen as regards the building permit by the scheduled closing date of June 7, 1999.
As the closing date approached the Millers learned that Peter Guimaraes did not own the lot the house was to be built on. The information came to light when the attorney for the Millers, Attorney Greg Shettle, commissioned the title search of lot #31. A problem ensued when the bank in its allocation of funds determined that $57,000 would be disbursed for the land which together with the $41,000 the Millers had given Guimaraes Construction would cover the cost of the land. However, since neither Peter Guimaraes nor Guimaraes Construction owned the land its purchase was to take place at the closing; and the Millers were told by Peter Guimaraes, through his closing attorney, that the Millers would have to come up with an additional $38,000. This they refused to do. Their position was that they had given a deposit of $41,000 toward the land and that this together with the bank's $57,000 took care of the money needed by Peter Guimaraes to purchase the lot from its owner Trinity Ridge Assoc.
The bank subsequently agreed to allocate $66,000 toward the cost of the land. This amount would have reduced to $23,000 the additional money needed to be brought to the closing to buy the land. The Millers did not approve of the bank's increased allocation.
A subsequent closing was set for June 17, 1999. At that time final house drawings were to be received, the building permit was to be presented, and the Millers were not to bring to the closing any additional cash for the lot. The closing did not take place because the Millers never saw the final drawings of their house; Peter Guimaraes did not apply for a building permit, and the Millers were still expected to bring money toward the cost of the lot. The instant suit followed.
Count one of the complaint claims fraudulent misrepresentation. The elements of a fraud action are: "(1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his CT Page 5195 detriment." (citations omitted). Guilietti v. Guilietti, 65 Conn. App. 813,836 (2001). "Fraudulent intent must be proved, if at all, by `clear, precise and unequivocal evidence.'" (citations omitted). Tyers v. Coma,214 Conn. 8, 11 (1990).
When the Millers and Peter Guimaraes stood on lot #31 and discussed the possibility of having a house built, Peter Guimaraes had had a course of dealing with Trinity Ridge which left no question in his mind that he could get the lot if he needed it to build on. And, in fact, the written agreement entered into initially with Trinity Ridge was extended after the Millers had entered into the construction agreement with Peter Guimaraes Construction Corporation.
The defendants contend Peter Guimaraes had equitable title based on the written agreement he had with Trinity Ridge. However, the date for the purchase to take place under that agreement was long past when the Millers appeared on the scene. But there is sufficient ambiguity in the response Peter Guimaraes gave to the Millers and Mrs. Volpe to prelude a finding by the court that a false representation i.e., that he owned the lot, was made by Peter Guimaraes as a statement of fact. The court concludes therefore that the plaintiffs have failed to prove by clear, precise and unequivocal evidence their claim of fraudulent misrepresentation.
Count two of the complaint claims a CUTPA violation premised on the proposition that a seller's material nondisclosure in a real estate transaction is violative of CUTPA. See Catucci v. Oullette,25 Conn. App. 56, 59-60 (1991).
Connecticut General Statutes § 41-110b (a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."
Connecticut Courts have adopted "the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other business persons] . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . ." Hartford Electric Supply Co. v. Allen-Bradley Col.,250 Conn. 334, 368 (1999). CT Page 5196
"[A] violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." Web Press Services Corp. v. New London Motors, Inc., 203 Conn. 342,355, following remand, 205 Conn. 479 (1987).
An act or practice is deceptive if three conditions are met: "First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material — that is, likely to affect consumer decisions or conduct." Caldor, Inc. v. Heslin,215 Conn. 590, 597 (1990), cert denied, 498 U.S. 1088 (1991).
There is no question that the Millers were under the impression that the defendants owned lot #31. The defendants at no time told the Millers that they did not own the lot. As far as Peter Guimaraes was concerned it was none of the Miller's business what his arrangement with the lot was. But for the fact that the defendants were expecting the Millers to come up with additional money at the closing to put toward the purchase of the lot, the defendants would have been correct. It would have made no difference what the defendants' arrangement with Trinity Ridge was so long as the defendants could turn over ownership of the lot at the closing. The Millers had to close on the lot in order to get their construction mortgage.
Just before the June 7, 1999, closing was to take place the Millers were told they had to come up with an additional $38,000.00 to supplement the Bank's $57,000.00 in order for the defendants to purchase the lot from Trinity Ridge. Under these circumstances it was a material nondisclosure for the defendants not to disclose to the Millers that the defendants did not own the lot. That the defendants had expected the bank to come up with a larger payment toward the cost of the lot is not relevant.
The problem with not owning the lot is that the defendants looked to the Millers to make up any shortfall between what the bank allocated to the cost of the lot and the cost of the lot. This in spite of the fact that the construction agreement entered into between the Millers and the defendants did not provide for other than the $40,000 already given by the Millers. This is what makes the nondisclosure of the lot's ownership status a material nondisclosure. It was one of the reasons the closing did not go forward, the Millers being unwilling to come up with any more money than that which they had already paid under the construction agreement. This court concludes that withholding information from the Millers regarding ownership of lot #31 constituted a CUTPA violation. CT Page 5197 Judgement may enter as to count two in favor of the Plaintiffs, a hearing will be held to determine attorney fees.
Count three of the complaint claims common law conversion. "Conversion occurs when one, without authorization, assumes and exercises the right of ownership over property belonging to another, to the exclusion of the owner's rights (citation omitted) . . . conversions are grouped into two general classes. The first class pertains to instances of tortious taking in that the possession is originally wrongful. . . . The second class is where the possession, originally rightful, becomes wrongful by reason thereafter of a wrongful detention, or a wrongful use of the property, or the exercise of an unauthorized dominion over the property. . . . Since the possession is rightful . . . there can be no conversion until the possessor refused to deliver up the property upon demand." Epstein v.Automatic Enterprises, 6 Conn. App. 484, 488 (1986).
Whether or not the defendants committed the tort of conversion as to the $41,000 depends upon whether the funds were solicited from the plaintiffs under false pretenses, the false pretenses being nondisclosure by Peter Guimaraes that his company Guimaraes Construction, Inc. did not own lot #31.
The defendants contend that by virtue of the February 20, 1998 purchase agreement for the lot with Trinity Ridge the defendant Guimaraes Construction, Inc. was in equity the owner of the lot as of April 2, 1999, when the construction agreement was entered into with the Millers.
The doctrine of equitable conversion on which the defendants rely requires an enforceable executory contract for the conveyance of the land. "Under the doctrine of equitable conversion . . . the purchaser of the land under an executory contract is regarded as the owner, subject to the vendor's lien for the unpaid purchase price . . . Society for Savingsv. Bragg, 38 Conn. Sup. 8, 13 (1981). In the instant case there was no enforceable executory contract in place when the construction agreement was entered into on April 2, 1999 and the $40,000 paid over to Peter Guimaraes by the Millers. The February 20, 1998 purchase agreement Peter Guimaraes and Guimaraes Development had with Trinity Ridge for lot #31 was well past the closing date of June 20, 1998, specified in that agreement.
This court finds there was no enforceable executory agreement to support the defendants claim of equitable conversion. The defendants ownership claim ended months before the defendants entered into the construction agreement under which the Millers paid over the $40,000.
Since a corporation acts through the agency of a natural person such as CT Page 5198 a director or officer thereof, that person cannot use his representative capacity to shield himself from the consequences of his own representative tortious conduct. "`Where . . . an agent . . . commits or participates in the commission of a tort, whether or not he acts on behalf of his principal . . . he is liable to third persons injured thereby.Scribner v. O'Brien, Inc., 169 Conn. 389, 404, 363 A.2d 160 (1975).'"Maturo v. Gerard, 196 Conn. 584, 588 (1985). "An agent who does acts which would otherwise constitute trespass to, or conversion of, a chattel is not relieved from liability by the fact that he acts on account of his principal and reasonably, although mistakenly, believes that the principal is entitled to possession of the chattel." Restatement, Second Agency Sec. 349 (conversion). Accordingly judgment enters in favor of the Plaintiffs against Peter Guimaraes and Guimaraes Construction, Inc. as to count three.
The court addresses next the count four breach of contract claim. At the time he represented to the Millers that they needed to put down $1,000 to hold the lot, Peter Guimaraes had no viable arrangement with the title owner of the lot, Trinity Ridge Limited Partnership (Trinity Ridge) which gave him any ownership rights in lot #31. The fact that over the years Trinity Ridge's principal Antonio Sabatini and Peter Guimaraes had informal arrangements whereby Sabatini was willing to wait for Peter Guimaraes to find prospects after which title to the land would be transferred to Guimaraes Construction, Inc. at the closing, cannot be taken as a basis for a claim of equitable ownership particularly in the case of lot #31 where the initial agreement between Sabatini and Guimaraes Construction, Inc. had long since expired at the time Peter Guimaraes saw the Millers at the first meeting on the property.
Had Peter Guimaraes owned the lot the parties would not have been in the instant litigation. Because Peter Guimaraes did not own the lot he had to come up with the money to make up the difference between what the American Savings Bank was going to release toward the lot which was $57,000 and the value of the lot which the bank had as $95,000. The bank looked at the amount the Millers had given toward the lot and made up the difference. When Peter Guimaraes learned what the bank was allocating his attorney notified the Millers that they would have to have an additional $38,000 in hand at the closing. At the same time the Millers' attorney, Attorney Shettle learned from his title search that title to the lot was in Trinity Ridge. It then came out that Peter Guimaraes was intending to purchase the lot from Trinity Ridge at the closing, after which he would turn over title to the Millers thus enabling the closing for the construction mortgage money to go thru.
There was nothing in the written agreement between the Millers and Guimaraes Construction which stated that the $41,000 was to be put toward CT Page 5199 construction costs rather than the price of the lot. Article II of the construction contract reads as follows:
 "The contract sum and payment: The buyers shall pay to the contractor for the performance of this contract, the sum of $338,145.00. Deposit of $40,000.00 (Forty Thousand) to be paid with the signing of this contract. The balance of $298,145.00 to be paid throughout the construction phase according to buyer's bank disbursements. Closing will take place on or before October 2, 1999.
Since the lot was to be purchased by Guimaraes Construction at the closing, the bank allocated $57,000 of its mortgage money to be used at the closing for that purpose. This is clearly in accordance with the above stated Article II of the Construction Contract. Nothing in that article required the Millers to bring to the closing any additional money over and above the $41,000 which they had already paid when they signed the construction contract.
The demand made by Peter Guimaraes was that the Millers bring an additional $38,000 to the closing which sum together with the bank's $57,000 would provide the money needed to purchase the lot at the closing. The reason given by Peter Guimaraes was that the $41,000 was intended to go toward construction costs. There is nothing in the construction contract which states this. In fact the clear language of Article II is that the bank would come up with $298,145.00 which together with the $40,000 would cover both the lot and the house.
The Millers refused to go forward with the closing on June 7, 1999 when they were told they had to bring $38,000 to the closing. This was to be in addition to the $41,000 they had already paid Guimaraes Construction on April 2, 1999. Prior to this the Millers had learned that lot #31 had wetlands for which Peter Guimaraes had to secure a wetlands permit before he could get a building permit. These permits needed house plans. Up to the time when the closing was to take place on June 7, 1999, the Millers had received no final plans for their house. The bank still had the plans from an already existing house Peter Guimaraes had built which was like the Millers'. An application for a Wetlands Permit had been made by Peter Guimaraes who signed as the owner of lot #31. Some months later this permit was revoked by the Wetlands Commission when it learned Peter Guimaraes was not the owner of the lot.
A subsequent closing date of June 17, 1999, came and went without a closing since the same problems existed and were not resolved. Though the Plans were completed on June 16, 1999, according to the architects CT Page 5200 billing records, there is no record as to when these were delivered to Peter Guimaraes by Mark Carey, the architect. The Millers never received a final copy of the house plans. Peter Guimaraes never applied for a building permit. Nor was there any communication to the Millers or their attorney, Greg Shettle, that Peter Guimaraes or Guimaraes Construction would come up with the money needed to purchase lot #31 from Trinity Ridge.
On the facts found this court concludes that the Millers have proven by a preponderance of the evidence that the contract entered into by the Millers with the defendants Peter Guimaraes and Guimaraes Construction was breached by the defendants. That breach consisted of the defendants placing an additional money requirement on the Millers which was not called for under the terms of the construction agreement, that is the need to bring $38,000 to the closing in order to buy the lot. A further breach consisted of the failure of the defendants to get the necessary permits by either June 7, 1999, or June 17, 1999, the Millers having agreed to extend the date of April 30, 1999, specified in the construction agreement. Though there was no reference in the construction agreement to the blue prints or plans for the house which the defendants were to build for the Millers, in order to get a building permit final plans for the house had to be presented to the Town. The architect's records showed he finished them on June 16, 1999, the Millers never saw them. These plans were not available in time to be used to get a building permit for the June 17, 1999, closing.
According to Peter Guimaraes he treated his two corporations, Guimaraes Development, Inc. and Guimaraes Construction, Inc. as if they were the same entity. Guimaraes Construction did not have its own bank account. The Plaintiffs' deposits were put in the bank account of Guimaraes Development, Inc. The construction contract entered into between the Millers and Guimaraes Construction involved lot #31 with which Guimaraes Development and not Guimaraes Construction had the contract with Trinity Ridge for its purchase.
Under Connecticut law the corporate veil may be pierced under the "instrumentality" or "identity" rules. United Electrical Contractors,Inc. v. Pragneas Builders, Inc., 26 Conn. App. 749 (1992).
"Under the instrumentality rule, in any case but that of express agency, proof of three elements is required. "`(1) Control, not mere majority or complete stock control, but complete domination, not only of finance but of policy and business practice in respect to the transaction attached so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to CT Page 5201 perpetuate the violation of a statutory or other positive legal duty, or a disclosure at or unjust act in contravention of plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury for unjust loss complained of." (citations omitted). United Electrical Contractors, Inc., supra at 756.
The identity rule "primarily applies to prevent injustice in the situation where two corporate entities are, in reality controlled as one enterprise because of the existence of common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities." (citation omitted) UnitedElectrical Contractors, Inc., supra at 756.
"The concept of piercing the corporate veil is equitable in nature."Angelo Tomasso, Inc. v. Akron Construction Paving, Inc., 187 Conn. 544,555 (1982). "`No hard and fast rule, however, as to the conditions under which the entity may be disregarded can be stated as they vary according to the circumstances of each case. (citation omitted)'" supra at 556. ". . . the very factor in any decision to disregard the separate corporate entity is the element of control or influence exercised by the individual sought to be held liable over corporate affairs." supra at 556-557.
The facts found based on the evidence presented leaves no doubt but that Peter Guimaraes had complete domination, not only of finances but of policy and business practice of Guimaraes Construction; and that he treated Guimaraes Construction, Inc. and Guimaraes Development, Inc. as a single entity. This court concludes that it is appropriate to pierce defendant Guimaraes Construction, Inc.'s corporate veil in order to also impose contractual liability upon defendant Peter Guimaraes in his individual capacity.
Count five of the complaint claims a breach of implied duty of good faith and fair dealing. "To prove a claim for bad faith under Connecticut law, the plaintiffs are required to prove that the defendants engaged in conduct design[ed] to mislead or to deceive . . . or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to ones rights or duties. . . . It contemplates a state of mind affirmatively operating with furtive design or ill will;" Chapmanv. Norfolk Dedham Mutual Fire Ins. Co., 39 Conn. App. 306, 320 (1995).
In the instant case under the construction agreement permits were to be secured by a date certain. They were not. Final blue prints were to be available by the closing date. They were not. The defendants did not tell the plaintiffs that the lot was not owned by Guimaraes Construction, Inc. when the defendants took the $1,000 to hold it and the subsequent $40,000 toward its purchase. Finally in this case the Plaintiffs were CT Page 5202 being looked to to bring additional money over and above the $41,000 to the closing in order to close on the lot even though the construction agreement did not so provide.
Sometime after the construction agreement was signed the Millers learned that there were wetlands on the lot and that a wetland permit had to be secured by the defendants. This was communicated by phone calls from Peter Guimaraes to the Millers whereupon the Millers asked for their $41,000 back. Peter Guimaraes using very strong language toward them told the Millers they would have to take him to court to get their money and that legal proceedings would end up costing them more than the money they were seeking to recover. Faced with this as a prospect the Millers decided to stay with the project.
This court is satisfied that the defendants engaged in conduct designed to mislead and that this was on the part of the defendants a refusal to fulfill their contractual obligations and that this refusal was not prompted by an honest mistake as to their duties. Accordingly judgment may enter as to Count Five for the Plaintiffs Layne and Paula Miller against the defendants Peter Guimaraes and Guimaraes Construction, Inc.
The defendants have pled counterclaims of Breach of Contract and breach of the duty of good faith and fair dealing against the Millers. The facts found by this court do not support the defendants' claims. This courts decision as to count four, the Plaintiff's breach of contract claim, is dispositive of the defendants' breach of contract claim. Similarly, this court's decision as to count five the Plaintiffs' breach of implied duty of good faith and fair dealing, is dispositive of the defendants' breach of their duty of good faith and fair dealing claim.
Judgment may enter in favor of Layne Miller and Paula Miller on the defendants' counterclaims of Breach of Contract and Breach of the duty of good faith and fair dealings.
The defendants' claim of set off is in fact a claim for damages resulting from an alleged breach of contract. Since the facts found by this court do not support the defendants' Breach of Contract claim, there are no damages attributable to the Plaintiffs.
The defendants' motion for judgment of dismissal for failure to make out a prima facie case is denied.
As to count one, the fraudulent misrepresentation claim, judgment may enter in favor of the defendants Peter Guimaraes and Guimaraes Construction, Inc. CT Page 5203
As to count two, the conversion claim, judgment may enter in favor of the Plaintiffs Layne Miller and Paula Miller against the defendants Peter Guimaraes and Guimaraes Construction, Inc. in the amount of $41,000 together with interest from April 15, 1999 to the date of this decision at the rate of 8% per annum pursuant to C.G.S. § 371(a).
As to count three, the CUTPA claim, judgment may enter in favor of the Plaintiff Layne Miller and Paula Miller against the defendants Peter Guimaraes and Guimaraes Construction, Inc. in the amount of $41,000 together with attorney fees to be determined in a separate hearing.
As to count four, the breach of contract claim, judgment may enter in favor of Layne Miller and Paula Miller against the defendants Peter Guimaraes and Guimaraes Construction, Inc. in the amount of $41,000.
As to count five, the breach of good faith and fair dealing claim, judgment may enter in favor of Layne Miller and Paula Miller against the defendants Peter Guimaraes and Guimaraes Construction, Inc. in the amount of $41,000.
Because each count in which the Plaintiffs prevailed had to be addressed with its own damage claim, the court's decision addresses each count with an award of damages. However, it is not the intent of this court's decision that the $41,000 be quadrupled. The sum total of the Plaintiffs' award is $41,000 plus interest at 8% from April 15, 1999 to the date of this decision, plus attorney fees.
Hennessey, J.